UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17 C 3607 |
| v. | ) | |
| | ) | Chief Judge Rubén Castillo |
| AT&T SERVICES, INC. et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

James Thompson ("Plaintiff"), on behalf of himself and a putative class of individuals

that allegedly received unsolicited telephone calls, filed this action pursuant to the Telephone

Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, against Sutherland Global Services, Inc.

("Defendant").[1] (R. 40, Second Am. Compl. ¶¶ 44-61.) Defendant moves to compel arbitration

and stay this case pending arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C.

§ 1 *et. seq.* (R. 56, Sutherland Mot. at 3.) Also before the Court is Plaintiff's motion to strike

evidence and arguments offered in support of Defendant's motion to compel arbitration. (R. 61,

Mot. to Strike at 2-6.) For the reasons stated below, Defendant's motion is denied, and Plaintiff's

motion is granted.

## BACKGROUND

Plaintiff is an individual that resides in the Northern District of Illinois. (R. 40, Second

Am. Compl. ¶ 8.) Defendant is a New York corporation headquartered in Pittsfield, New York,

that AT&T Services, Inc. ("AT&T") allegedly contracted to call AT&T customers. (*Id.* ¶¶ 14,

36, 46-52.) More specifically, Defendant placed customer service telephone calls on AT&T's

---

[1] As explained in more detail below, although AT&T Services, Inc. is referenced in the case caption,
Plaintiff voluntarily substituted this party out of the case. (R. 57, Notice; R. 58, Order.)

behalf related to AT&T's U-verse Internet service. (R. 60-1, Barker Decl. at 1-2.) On those telephone calls, Defendant's employees "identified the call as coming from AT&T customer service." (*Id.* at 2.) AT&T determined which customers should be called, provided Defendant with the telephone numbers to be called, drafted the scripts to be used in the calls, and "had the right to control what calls [Defendant] made and under what rules." (*Id.* at 3-4.) Defendant has submitted a declaration from AT&T's lead product marketing manager, Kristina Carter, who states "AT&T remained closely involved in the placing of the calls and [Defendant] acted as its agent in placing the calls." (R. 60-2, Carter Decl. at 2-3.)

Plaintiff alleges that on December 24, 2015, Defendant called Plaintiff's cellular phone twice on AT&T's behalf and played a prerecorded voice message. (R. 40, Second Am. Compl. ¶¶ 2, 19-20, 25.) Plaintiff also alleges that he received an unsolicited call from Defendant to his cellular phone on March 23, 2016, and that he continued to receive other unsolicited phone calls during the years that followed. (*Id.* ¶¶ 25, 27-28.) Plaintiff claims that these calls were made using an automatic telephone dialing system, which had the capacity to store or produce telephone numbers that could be randomly dialed. (*Id.* ¶¶ 26-27, 30, 32-33, 36.) These unsolicited calls allegedly not only targeted Plaintiff but were also placed to hundreds of other persons. (*Id.* ¶¶ 53-61.)

Plaintiff registered for AT&T's U-verse Internet service in 2016, and he accepted the terms of service associated with AT&T's U-verse Internet service on March 28, 2016. (R. 49-4, Phillips Decl. at 1; R. 49-3, Harman Decl. at 1-2.) AT&T's U-verse service is provided to Illinois customers by Illinois Bell Telephone Company ("Illinois Bell"), an AT&T entity. (R. 49-3, Harman Decl. at 1; R. 49-3 at 6, 29 n.1, Feb. 2016 Terms of Service.) At the time Plaintiff registered for U-verse service, he was required to complete an online form that prompted him to

2

check a box confirming that he read and agreed to AT&T's terms of service. (R. 49-2, Drake Decl. at 1-2.) The words "terms of service" on the online form were hyperlinked to a webpage displaying AT&T's terms of service in effect at the time. (*Id.*) Plaintiff could not complete registration for AT&T's U-verse service without checking the box confirming that he read and agreed to the terms of service. (*Id.*)

AT&T has presented two separate terms of service in effect at the times Plaintiff registered and paid for AT&T's U-verse service, (R. 49-3, Harman Decl. at 1), both of which have provisions relating to arbitration that are the same in all material respects. The terms of service provide that "this is a binding agreement between you . . . and the AT&T entity that provides the [U-verse service]," which in this case was Illinois Bell. (R. 49-3, Harman Decl. at 1; R. 49-3 at 6, 29 n.1, Feb. 2016 Terms of Service; R. 49-3 at 34, 57 n.1, March 2016 Terms of Service.) The terms of service required "arbitration on an individual basis to resolve disputes, rather than jury trials or class actions." (R. 49-3 at 6, Feb. 2016 Terms of Service; R. 49-3 at 34, March 2016 Terms of Service.) This extended to "all disputes and claims between you and AT&T," including but not limited "[c]laims arising out of or relating to any aspect of the relationship between us[;] . . . [c]laims that arose before this or any prior Agreement . . . [;] [c]laims that are currently the subject of purported class action litigation in which you are not a member of a certified class[;]" and "[c]laims that may arise after the termination of this Agreement." (R. 49-3 at 22, Feb. 2016 Terms of Service; R. 49-3 at 50, March 2016 Terms of Service.) The arbitration agreement also provided that references to "'AT&T,' 'you,' and 'us'" include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of [U-verse] . . . under this or prior Agreements between us." (R. 49-3 at 22, Feb. 2016 Terms of

Service; R. 49-3 at 50, March 2016 Terms of Service.) The language in the terms of service requiring arbitration and waiving the right to participate in a class action was displayed in bold-faced font and all capital letters. (R. 49-3 at 6, 22, 24, Feb. 2016 Terms of Service; R. 49-3 at 34, 50, 52, March 2016 Terms of Service.)

The terms of service also provided that the "Federal Arbitration Act governs the interpretation and enforcement" of the arbitration agreement, and that the arbitration agreement "evidences a transaction in interstate commerce[.]" (R. 49-3 at 22, Feb. 2016 Terms of Service; R. 49-3 at 51, March 2016 Terms of Service.) Both terms of service set forth that the "arbitration provision shall survive termination of this Agreement." (R. 49-3 at 22, Feb. 2016 Terms of Service; R. 49-3 at 51, March 2016 Terms of Service.)

Plaintiff declares under penalty of perjury that he "did not agree to arbitrate any claims with AT&T or any other party." (R. 59-1, Thompson Decl. at 2.) Plaintiff also declares that on January 6, 2016, and April 12, 2016, he "mailed AT&T letters expressly opting out of any arbitration clause [AT&T] might contend applies[.]" (*Id.*) Plaintiff, however, paid for U-verse service from March 2016 through September 2016. (R. 49-4, Phillips Decl. at 1.) Both terms of service provide that AT&T may change the terms of service by providing "you with notice of material changes," and that "[y]our continued subscription to [U-verse] after the effective date of the change constitutes your acceptance of such changes." (R. 49-3 at 6, Feb. 2016 Terms of Service; R. 49-3 at 34, March 2016 Terms of Service.) They further provide that "if AT&T makes any future change to this arbitration provision . . . during the period of time that you are receiving [U-verse] [s]ervices, you may reject such change by sending us written notice within 30 days of the change," and that by "rejecting any future change, you are agreeing you will

4

arbitrate any dispute between us in accordance with the language of this provision." (R. 49-3 at 24, Feb. 2016 Terms of Service; R. 49-3 at 52, March 2016 Terms of Service.)

## PROCEDURAL HISTORY

On May 12, 2017, Plaintiff filed a complaint against AT&T Corp. alleging violations of the TCPA. (R. 1, Compl. ¶¶ 25-33.) Plaintiff amended his complaint on October 19, 2017, and then filed a seconded amended complaint on May 10, 2018, which removed AT&T Corp. as a defendant and added AT&T, Illinois Bell, and Sutherland Global Services, Inc. as defendants. (R. 15, Am. Compl.; R. 40, Second Am. Compl.) The second amended complaint is the operative complaint, and it advances one count for violation of the TCPA against AT&T, Illinois Bell, and Defendant for the allegedly unsolicited calls that Plaintiff received. (R. 40, Second Am. Compl. ¶¶ 2, 5, 15-52.) Plaintiff brings this action on behalf of himself and a putative class consisting of persons who received a phone call on their cellular phone on or after May 12, 2013, by the same autodialing machine that allegedly called Plaintiff, as well as those persons who received a pre-recorded message like the one Plaintiff received. (*Id.* ¶¶ 53-61.)

On May 31, 2018, AT&T and Illinois Bell moved to compel arbitration. (R. 49, AT&T Mot.) They argued that the Court should compel arbitration because Plaintiff accepted and registered for AT&T's U-verse Internet service which required him to agree to the terms and conditions of that service, one of which was an agreement to arbitrate on an individual basis "all disputes and claims" between Plaintiff and AT&T. (R. 49-1, Mem. at 2-13 (emphasis removed from original).) AT&T and Illinois Bell also contended that Defendant "is a vendor that placed the alleged calls on behalf of AT&T;" therefore, those claims "also fall within the scope of the arbitration clause and should be compelled to arbitration[.]" (*Id.* at 1 n.1, 12.) On June 5, 2018,

the Court stayed discovery until after the Court's ruling on AT&T's and Illinois Bell's motion to compel arbitration. (R. 54, Min. Entry.)

On June 15, 2018, Defendant also moved to compel arbitration. (R. 56, Sutherland Mot.) Defendant states in its motion that it "joins in, relies on[,] and incorporates" AT&T's and Illinois Bell's motion to compel arbitration. (*Id.* at 2.) Defendant argues that because Plaintiff alleges that it made calls on behalf of AT&T, "the claims against [Defendant] also fall within the scope of the arbitration clause[.]" (*Id.* at 3.)

On June 19, 2018, Plaintiff notified the Court of its intent to voluntarily dismiss AT&T and Illinois Bell from the case without prejudice, and the Court dismissed those parties from the case. (R. 57, Notice; R. 58, Order.) Thereafter, on July 16, 2018, Plaintiff responded to Defendant's motion to compel arbitration. (R. 59, Resp.) Plaintiff maintains that any arbitration agreement he entered into with Illinois Bell or AT&T does not extend to his claims against Defendant because Defendant was not a party to any such arbitration agreement. (*Id.* at 6-9.) Plaintiff alternatively argues that if an agreement to arbitrate with Defendant does exist, such an agreement is unconscionable and therefore unenforceable. (*Id.* at 9-12.)

On July 31, 2018, Defendant filed a reply brief in support of its motion to compel arbitration, which contends that the arbitration agreement in the U-verse terms of service applies to any claims raised against Defendant because Defendant is AT&T's agent. (R. 60, Reply at 2-5.) Defendant further argues in its reply that the arbitration agreement is not unconscionable. (*Id.* at 5-9.) Defendant also filed declarations to support its position that it is AT&T's agent. (R. 60-1, Barker Decl.; R. 60-2, Carter Decl.)

On August 3, 2018, Plaintiff moved to strike Defendant's argument that it is AT&T's agent and the declarations in support, claiming that the argument and declarations were

improperly raised for the first time in a reply brief. (R. 61, Mot. to Strike at 2-6.) Plaintiff also asks that if the Court considers Defendant's reply arguments and declarations, that he be granted leave to conduct discovery on whether Defendant was AT&T's agent "so that the Court may consider the totality of circumstances that bear upon [the] issue." (*Id.* at 5-6.) In response, Defendant contends that it did not improperly raise new issues in its reply brief; rather it responded to Plaintiff's "belated" and "unexpected" argument that Defendant was not AT&T's agent. (R. 64, Resp. at 3-7.) Finally, Defendant argues that Plaintiff should not be entitled to additional discovery on the agency issue because he pleaded that Defendant is AT&T's agent, which is a "judicial admission that is binding on Plaintiff[.]" (*Id.* at 7.)

## LEGAL STANDARD

"Whether or not a company is bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the court on the basis of the contract entered into by the parties." *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 466 F.3d 577, 580 (7th Cir. 2006) (citation and internal alterations omitted). "Arbitrability of a dispute is often a question of law that does not depend on undisputed facts," but in some cases "it can present a mixed question of law and fact." *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 751 (7th Cir. 2017). The FAA "actually provides for jury trials on the question of arbitrability if there is a factual dispute as to whether 'an agreement for arbitration was made.'" *Id.* (quoting 9 U.S.C. § 4). While the "FAA does not expressly identify the evidentiary standard a party seeking to avoid compelled arbitration must meet," courts that "have addressed the question have analogized the standard to that required of a party opposing summary judgment under Rule 56[]: the opposing party must demonstrate that a genuine issue of material fact warranting a trial exists." *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). "Just as in summary judgment proceedings, a party cannot avoid compelled

arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Id.* The Court also accepts the non-movant's evidence as true and draws all justifiable inferences in the non-movant's favor. *Id.*; *see also Sanato v. Sears, Roebuck & Co.*, 259 F. Supp. 3d 873, 874-75 (N.D. Ill. 2016) ("The applicable standard is akin to a Rule 56 summary judgment standard, and the district court must accept the non-movant's evidence as true, drawing all reasonable inferences in his favor.").

"Once it is clear, however, that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012). Arbitration is required "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. TriMas Corp.*, 531 F.3d 531, 536 (7th Cir. 2008) (citation omitted); *see also Conway v. Done Rite Recovery Servs., Inc.*, No. 14-CV-5182, 2015 WL 1989665, at *2 (N.D. Ill. Apr. 30, 2015) (observing that when the parties have entered into an arbitration agreement, "the standard for compelling arbitration is low"). "The party seeking to invalidate or oppose the arbitration agreement bears the burden of demonstrating that the arbitration agreement is unenforceable and that the claims are unsuitable for arbitration." *Paragon Micro, Inc. v. Bundy*, 22 F. Supp. 3d 880, 887 (N.D. Ill. 2014).

## ANALYSIS

The FAA provides that "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable,

and enforceable, save upon such grounds as exist at law or in equity for the revocation of any
contract." 9 U.S.C. § 2. "Under the FAA, arbitration should be compelled if three elements are
present: (1) an enforceable written agreement to arbitrate, (2) a dispute within the scope of the
arbitration agreement, and (3) a refusal to arbitrate." *Scheurer*, 863 F.3d at 752. The FAA
"requires courts to place arbitration agreements on equal footing with all other contracts."
*Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1424 (2017) (citation and internal
quotation marks omitted). It, however, provides "no refuge for defenses that apply only to
arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue."
*Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1622 (2018) (citation and internal quotation marks
omitted) (rejecting argument against enforcement of arbitration agreement because the plaintiff
employees "don't suggest that their arbitration agreements were extracted, say, by an act of fraud
or duress or in some other unconscionable way that would render *any* contract unenforceable"
but instead only objected "to their agreements precisely because they require individualized
arbitration proceedings instead of class or collective ones").

   "At bottom . . . arbitration is contractual." *Scheurer*, 863 F.3d at 752. "A party cannot be
required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* (citation
and internal quotation marks omitted). "When deciding whether the parties agreed to arbitrate a
certain matter, courts generally should apply ordinary state-law principles that govern the
formation of contracts." *Druco Rests., Inc. v. Steak N Shake Enters., Inc.*, 765 F.3d 776, 781 (7th
Cir. 2014). Accordingly, the Court applies Illinois' substantive law in its analysis because the
parties do not raise a choice of law issue, and they cite to Illinois law in their briefs, (R. 49-1,
AT&T Mem. at 9; R. 59, Resp. at 6, 8-10 & n.6; R. 60, Reply at 5; R. 64, Resp. at 4). *See
Selective Ins. Co. of S.C. v. Target Corp.*, 845 F.3d 263, 266 (7th Cir. 2016) ("If no party raises a

9

choice of law issue to the district court, the federal court may simply apply the forum state's substantive law." (citation and internal quotation marks omitted)), *as amended* (Jan. 25, 2017).

The arbitration agreement at issue was entered into by clicking a box on a form available on the Internet that acknowledged Plaintiff's consent to terms of service that contain the arbitration agreement. (R. 49-2, Drake Decl. at 2; R. 49-3 at 6, Feb. 2016 Terms of Service; R. 49-3 at 34, March 2016 Terms of Service.) "In Illinois, as in many states, the law governing the formation of contracts on the Internet is still in the early stages of development." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016). Nevertheless, Illinois' general contract principles—particularly the principle that formation of a contract requires mutual assent—offer guidance on contracts formed by agreeing to terms of service on a website. *Id.* "Illinois courts use an objective approach" to determine whether parties mutually assented to the terms of a particular agreement. *Id.* Pursuant to this approach, "intent to manifest assent . . . is revealed by outward expressions such as words and acts." *Id.* (citation and internal quotation marks omitted). "The parties do not need to share the same subjective understanding as to the terms of the contract," but "there must be a meeting of the minds or mutual assent as to the terms of the contract." *Id.* (citation and internal quotation marks omitted).

When looking to agreements formed by clicking a box on a web page, the Court must engage in a "fact-intensive inquiry" that analyzes "whether the web pages presented to the consumer adequately communicate all the terms and conditions of the agreement, and whether the circumstances support the assumption that the purchaser receives reasonable notice of those terms." *Id.* at 1034-35. The Court "cannot presume that a person who clicks on a box that appears on a computer screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.)," and must "look more closely at

both the law and the facts to see if a reasonable person in [the plaintiff's] shoes would have realized that he was assenting to" an arbitration agreement. *Id.* at 1035.

Despite this cautious and fact-intensive inquiry, it is now well-established that arbitration agreements like the one at issue in this case are not unconscionable and provide adequate notice of mandatory arbitration to consumers. For example, in *Sherman v. AT&T Inc.*, No. 11 C 5857, 2012 WL 1021823 (N.D. Ill. Mar. 26, 2012), the plaintiff could not activate his AT&T Internet service until he completed an online registration that required him to "check a box labeled 'I have read and agree to the AT&T Terms of Service, Acceptable Use Policy, AT&T and Yahoo Privacy Policies, Wi-Fi Terms of Service.'" *Sherman*, 2012 WL 1021823, at *1. The terms of service in that case, like this one, had an arbitration agreement, and the court ruled that the arbitration agreement was not unconscionable, was entered into mutually by both parties, and that the plaintiff had adequate notice of the arbitration clause. *Id.* at *1, 3-5 (applying Illinois law). The court also expressly noted that "[t]he Seventh Circuit has repeatedly upheld such a process of informing a customer of the full terms and conditions" of the terms of a contract between parties. *Id.* at *3. Similarly, in *Friends for Health: Supporting N. Shore Health Ctr. v. PayPal, Inc.*, No. 17 CV 1542, 2018 WL 2933608 (N.D. Ill. June 12, 2018), the court compelled the plaintiffs to undergo arbitration against the defendant, PayPal, Inc., where "it would have been impossible for any of the plaintiffs to create a PayPal account" without "affirmatively check[ing] a box, or click[ing] a button, indicating that they accepted the user agreement," and the terms of the user agreement included an agreement to arbitrate all disputes. *PayPal, Inc.*, 2018 WL 2933608, at *4-5. Several other courts have arrived at the same conclusion. *See Sgouros*, 817 F.3d at 1036 (applying Illinois law and observing that "[a] website might be able to bind users to a service agreement by placing the agreement, or a scroll box containing the

11

agreement, or a clearly labeled hyperlink to the agreement, next to an 'I Accept' button that unambiguously pertains to that agreement"); *O'Quinn v. Comcast Corp.*, No. 10 C 2491, 2010 WL 4932665, at *3 (N.D. Ill. Nov. 29, 2010) (applying Illinois law and compelling arbitration where "Comcast . . . presented evidence . . . that [its] routine practice is to provide customers with the Customer Agreement at the time services are installed and to require the customer to click a box accepting the Customer Agreement in order to access Comcast's Internet service for the first time"); *Hubbert v. Dell Corp.*, 835 N.E.2d 113, 121-22 (Ill. App. Ct. 2005) (finding that a blue hyperlink with terms and conditions of sale associated with an online purchase of computers on the top of five different pages of the vendor's website provided notice to a reasonable person of the terms and conditions governing the sale, including an arbitration agreement). Accordingly, the Court finds that the arbitration agreement in the U-verse terms of service is enforceable, and the Court rejects Plaintiff's argument that it is unconscionable.

Plaintiff argues, though, that even if the arbitration agreement is enforceable, it does not cover disputes between Plaintiff and Defendant, because Defendant was not a party or signatory to the U-verse terms of service that contain the arbitration agreement. (R. 59, Resp. at 6-9.) "[T]he general rule is that non-signatories are not bound to arbitration agreements." *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1060 (7th Cir. 2018). "[T]raditional principles of state law" may, however, "allow a[n] [arbitration agreement] to be enforced by or against nonparties to the [agreement][.]" *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (citation and internal quotation marks omitted). "These traditional state law principles include: assumption, agency, veil piercing, alter ego, waiver, estoppel, third-party beneficiary, and incorporation by reference." *Warciak v. Subway Rests., Inc.*, 880 F.3d 870, 872 (7th Cir. 2018), *cert. denied*, 138 S. Ct. 2692 (2018). Defendant argues that it was AT&T's agent for purposes of placing calls and

therefore it can compel arbitration because the arbitration agreement in the U-verse terms of service covers disputes involving AT&T's "agents." (R. 60, Reply at 2-5.) "[T]he court applies state law when deciding whether a non-signatory to a contract can enforce an arbitration provision contained in that contract." *Brown v. Worldpac, Inc.*, No. 17 CV 6396, 2018 WL 656082, at *2 (N.D. Ill. Feb. 1, 2018) (citing *Scheurer*, 863 F.3d at 752).

In Illinois, "[t]he test of agency is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Krickl v. Girl Scouts, Ill. Crossroads Council, Inc.*, 930 N.E.2d 1096, 1100 (Ill. App. Ct. 2010). "Generally . . . the existence and scope of an agency relationship are questions of fact." *Caligiuri v. First Colony Life Ins. Co.*, 742 N.E.2d 750, 756 (Ill. App. Ct. 2000); *see also Lawlor v. N. Am. Corp. of Ill.*, 983 N.E.2d 414, 427 (Ill. 2012) ("The determination of whether a person is an agent or independent contractor rests upon the facts and circumstances of each case.").

To prove that it was AT&T's agent, Defendant has submitted declarations from one of its employees and an AT&T employee stating that Defendant was AT&T's agent and that AT&T determined which customers should be called, provided Defendant with the telephone numbers to be called, drafted the scripts to be used in the calls, and "had the right to control what calls Defendant made and under what rules." (R. 60-1, Barker Decl. at 2-3; R. 60-2, Carter Decl. at 3-4.) These declarations, however, were submitted for the first time with Defendant's reply brief, and not with Defendant's initial motion to compel arbitration. Defendant's initial motion was filed without any supporting evidence and largely relied on AT&T's motion to compel arbitration, which it incorporates by reference. (R. 56, Sutherland Mot. at 2.) Like Defendant's motion to compel arbitration, AT&T's motion provided no evidence demonstrating an agency

13

relationship between Defendant and AT&T. (*See* R. 49-2, Drake Decl.; R. 49-3, Harman Decl.; R. 49-4, Phillips Decl.; R. 49-5, Steinmetz Decl.) Defendant also does not dispute that its reply brief advances evidence and arguments for the first time, and instead argues that it raised these matters for the first time in the reply brief because "[it] was not until Plaintiff filed his Response to the Motion to Compel . . . that there was any suggestion in this case that Sutherland was *not* acting as AT&T's agent." (R. 64, Resp. at 3 (emphasis in original).)

"A party," however, "cannot make conclusory and underdeveloped arguments in its opening brief and then deign to support and develop those arguments in his or her reply brief." *Johnson v. Root*, 812 F. Supp. 2d 914, 924 (N.D. Ill. 2011). The Court, therefore, declines to consider evidence submitted for the first time with Defendant's reply brief and grants Plaintiff's motion to strike such evidence. *See Bernardo v. J.D. Nicholas & Assocs., Inc.*, No. 13 C 7085, 2014 WL 4913423, at *3 (N.D. Ill. Sept. 30, 2014) (granting motion to strike evidence because it was submitted for the first time as an exhibit to a reply memorandum); *Gold v. Wolpert*, 876 F.2d 1327, 1331 (7th Cir. 1989) (rejecting the plaintiff's attempt to raise "a new argument" and "new factual matters for the first time in his reply brief"). That leaves the Court with no evidence properly before it from which it can determine whether Defendant, as AT&T's agent, may invoke AT&T's arbitration agreement with Plaintiff and compel arbitration. As a result, Defendant fails to satisfy its burden to compel arbitration and its motion is denied. *Johnson v. Uber Techs., Inc.*, No. 16 C 5468, 2017 WL 1155384, at *2 (N.D. Ill. Mar. 13, 2017) (denying motion to compel arbitration, explaining that "the information that is lacking" to compel arbitration "is completely within Uber's control;" therefore, "Uber, as the movant, was required to present to the Court facts such that a reasonable jury could return a verdict in its favor").

Even if the Court were to consider the evidence submitted for the first time with Defendant's reply brief, that evidence largely consists of the conclusory testimony of an employee of Defendant and AT&T stating that Defendant was AT&T's agent and that AT&T "had the right to control what calls Defendant made and under what rules." (R. 60-1, Barker Decl. at 2-3; R. 60-2, Carter Decl. at 3-4.) There is no evidence demonstrating that right, such as a contract between Defendant and AT&T or other evidence showing that Defendant can affect the legal relationships of the AT&T. *See Krickl*, 930 N.E.2d at 1100. Plaintiff counters with a similarly self-serving and conclusory declaration stating, under penalty of perjury, that he never agreed to arbitrate claims with Defendant. (R. 59-1, Thompson Decl. at 2.) If the Court were to draw all reasonable inferences in Plaintiff's favor, the Court could not say that the record lacks genuine issues of fact related to arbitrability given the weak and conclusory evidence presented by both sides.

Additionally, Plaintiff has represented that he has not been afforded a fair opportunity to conduct discovery on the relationship between Defendant and AT&T to test whether Defendant was AT&T's agent because Defendant objected to such discovery as irrelevant. (R. 61, Mot. to Strike at 4-5.) Defendant does not refute this claim. Where discovery is necessary to resolve the issue of arbitrability, courts will require further discovery. *See Johnson*, 2017 WL 1155384, at *2 ("[T]he parties have not engaged in any discovery in this case. Accordingly, the Court orders the parties to engage in expedited discovery limited to the issue of formation of the arbitration agreement."); *Niebrugge v. King's Med. Grp., Inc.*, No. 08-1018, 2008 WL 2980034, at *3-4 (C.D. Ill. July 31, 2008) ("Discovery is necessary to determine whether KMG provided Niebrugge with any notice of the significant change to the language in the arbitration section. Without further information, it is not appropriate for this Court to grant KMG's Motion to Stay

Litigation and Compel Arbitration."). Thus, the Court concludes that expedited discovery is necessary to resolve whether Defendant is AT&T's agent and can invoke the arbitration clause in the AT&T U-verse terms of service.

Defendant argues that no further discovery is necessary because "Plaintiff himself [pleaded] agency in his Second Amended Complaint." (R. 64, Resp. at 7.) Plaintiff, however, alleges that Sutherland is AT&T's "vendor," (R. 40, Second Amended Complaint ¶ 50), which can be construed to allege that Defendant is AT&T's independent contractor rather than its agent. *See Jackson v. Bank of N.Y.*, 62 F. Supp. 3d 802, 815 (N.D. Ill. 2014) (ruling that "[t]here is a question of fact as to whether Clausell, the vendor retained by Safeguard, acted as Safeguard's agent" as opposed to its independent contractor). Additionally, a motion to compel arbitration is reviewed under a standard similar to a motion for summary judgment; therefore, it must be decided on evidence, not allegations. *See Tinder*, 305 F.3d at 735.

Defendant also argues that Plaintiff's allegations that Defendant acted on AT&T's behalf are a "judicial admission" that Defendant is AT&T's agent, but a party that acts on behalf of another can still be an independent contractor if it lacks authority to bind the principal or if the principal does not control the means and methods of performance. *See Krickl*, 930 N.E.2d at 1100. Likewise, although Plaintiff's allegation that AT&T is "vicariously liable" for Defendant's conduct suggests that an agency or similar relationship existed between AT&T and Defendant, (R. 40, Second Am. Compl. ¶ 38), this allegation merely uses a legal term of art and does not admit facts that resolve whether Defendant is AT&T's agent. *See Sperl v. C.H. Robinson Worldwide, Inc.*, 946 N.E.2d 463, 471 (2011) ("A fact finder's determination of whether an agency relationship exists should be made by considering all of the surrounding circumstances and actions of the parties, without exclusive weight being given to contractual labels or

provisions."). The Court, therefore, does not treat this allegation as a binding admission that Defendant is AT&T's agent. *See Smith v. MHI Injection Molding Mach., Inc.*, No. 10 C 8276, 2015 WL 7008128, at *2 (N.D. Ill. Nov. 12, 2015) ("Such admissions must be *deliberate, clear and unequivocal* statements made in the course of a judicial proceeding." (emphasis added)). Accordingly, the Court overrules Defendant's objection to Plaintiff's request to take discovery and denies Defendant's motion to compel arbitration without prejudice. The parties may proceed with expedited discovery on issues related to arbitrability, and such discovery shall be completed within 60 days of the date of this order.

## CONCLUSION

For the foregoing reasons, Defendant's motion to compel arbitration (R. 56) is DENIED without prejudice, and Plaintiff's motion to strike (R. 61) is GRANTED. The parties may proceed with discovery on issues related to arbitrability of this lawsuit. The parties are ordered to complete such discovery within 60 days of the date of this order. After this discovery period ends, the parties shall appear for a status hearing on December 5, 2018, to discuss whether there remain any disputed issues of fact as to whether Defendant can compel arbitration in this case. The parties are also DIRECTED to reevaluate their settlement positions in light of this opinion and to exhaust all settlement possibilities prior to the next status hearing.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: September 24, 2018**

17