UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES THOMPSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 17 C 3607 |
| v. ) | |
| ) | Chief Judge Rubén Castillo |
| SUTHERLAND GLOBAL SERVICES, ) | |
| INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

James Thompson ("Plaintiff"), on behalf of himself and a putative class of individuals who allegedly received unsolicited telephone calls, brings this action against Sutherland Global Services, Inc. ("Defendant") pursuant to the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. (R. 40, Second Am. Compl. ¶¶ 44-61.) Before the Court is Defendant's renewed motion to compel arbitration and stay this case pending arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3-4. (R. 69, Renewed Mot. at 1; R. 69-1, Mem. at 12.) For the reasons stated below, the Court grants Defendant's motion.

## BACKGROUND

The following facts are undisputed unless otherwise stated. The Court presumes familiarity with the material facts and allegations as described in its order issued on September 24, 2018, which related to Defendant's previous motion to compel arbitration. (R. 66, Order.) To summarize, Plaintiff is an individual who resides in the Northern District of Illinois and allegedly received unsolicited phone calls from Defendant about AT&T U-Verse Internet service. (*Id.* at 1-2.) Defendant is a New York corporation headquartered in Pittsfield, New York, that AT&T Services, Inc. ("AT&T") contracted with to call AT&T customers. (*Id.*)

Plaintiff registered for AT&T's U-verse Internet service and accepted the accompanying terms of service in March 2016. (*Id.* at 2.) The terms of service provide that "AT&T and you agree to arbitrate all disputes and claims between you and AT&T." (R. 49-3 at 22, Terms of Service.) "AT&T" is defined in the terms of service to include "AT&T Corporation"[1] and all local entities that provide AT&T U-Verse Internet service, which for Plaintiff—who resided in Illinois—was Illinois Bell Telephone Company ("Illinois Bell"). (*Id.* at 6, 29 n.1.) The arbitration agreement states that any references to "'AT&T,' 'you,' and 'us' include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of [U-verse] . . . under this or prior Agreements[.]" (*Id.* at 22.) The arbitration agreement covers "[c]laims arising out of or relating to any aspect of the relationship between us[;] . . . [c]laims that arose before this or any prior Agreement . . . [;] [c]laims that are currently the subject of purported class action litigation in which you are not a member of a certified class[;]" and "[c]laims that may arise after the termination of this Agreement." (*Id.*)

Michael Shannon Barker ("Barker"), AT&T's Vice President of Service Delivery, declares that AT&T hired Defendant to make phone calls to AT&T customers as part of AT&T's proactive churn management ("PCM") program.[2] (R. 69-2, Barker Decl. at 1-2.) The services under this program were carried out in accordance with a "Call Center Master Service

---

[1] This entity is affiliated with but a different entity than AT&T Services, Inc., the entity that the Court refers to in this opinion as "AT&T."

[2] AT&T's PCM program identified customers who were likely to "churn," or cancel or reduce services, and took steps to retain those customers. (*See* R. 69-2, Barker Decl. at 4; R. 70-2, PCM Order at 3.)

2

Agreement" ("MSA") and a separate work order ("PCM Order").[3] (*Id.*) Under the PCM Order, Defendant was to provide English and Spanish customer service support over the telephone to AT&T customers for the purpose of reducing AT&T customer churn by, among other things, proactively troubleshooting and resolving customer connectivity, home computer, and network issues. (*Id.* at 4; R. 70-2, PCM Order at 3.) Pursuant to the PCM program, Defendant made three calls to Plaintiff on December 24, 2015. (R. 69-2, Barker Decl. at 5; R. 69-3, Baker Decl. Ex. C. at 2.) Defendant placed these calls because Plaintiff had registered for AT&T's U-Verse service but had not yet installed the necessary equipment. (*Id.*)

Under the MSA and PCM Order, AT&T reserved the right to set Defendant's target call volume, the number of Defendant's employees working on the PCM program, and the personnel structure for the PCM program. (R. 70-2, PCM Order at 3-5.) AT&T also retained the right to be notified if any employment changes occurred, to set the hours that Defendant's employees would be available to work, and to designate the location from which Defendant's services would be provided. (*Id.*) In addition, AT&T reserved the right to choose and provide the technology that Defendant used to carry out PCM services. (*Id.* at 5-8.)

Kristina Carter ("Carter"), AT&T's Lead Product Marketing Manager, declares that AT&T retained control over both the manner and means of Defendant's calls on AT&T's behalf, and that AT&T required Defendant to hold itself out as AT&T when making calls to AT&T customers. (R. 69-4, Carter Decl. at 3.) The customers to be called by Defendant were selected by AT&T. (*Id.* at 3-4.) Any data generated from Defendant's calls were provided to AT&T. (*Id.*

---

[3] Where the Court cites or discusses portions of a document filed under seal, it is because the Court has determined that those portions of the document were improperly filed under seal. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010) ("Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality.").

3

at 4.) AT&T prepared training materials for Defendant's customer service representatives to use, Defendant's managers were directly trained by AT&T personnel, and AT&T placed an onsite manager with Defendant who "was responsible for overseeing [Defendant]." (*Id.* at 5-7.) Additionally, Defendant's employees were instructed by AT&T to tell AT&T customers that the calls were from "AT&T customer service" and not Defendant. (*Id.* at 4.) AT&T also provided scripts for Defendant's employees to follow when making calls to AT&T customers. (*Id.*)

Though Defendant had freedom to hire its own employees, AT&T "set the head count" for the PCM program, and Defendant's employees "were segregated from representatives [who] worked on other . . . projects, including other work [Defendant] did for AT&T." (*Id.* at 5.) AT&T obligated these employees "to have their own floor space at [Defendant's] call centers that required badge access[,] and to not share computers, printers, or other equipment with other [Defendant] projects." (*Id.*) AT&T held weekly performance meetings with Defendant that involved "measuring [Defendant's] results against AT&T's targets according to a variety of metrics identified by AT&T." (*Id.* at 6.) AT&T also held regular meetings to address Defendant's performance, and AT&T had access to Defendant's call centers to conduct regular site visits and review Defendant's work. (*Id.* at 5-6.) AT&T even had control over the music that AT&T customers would listen to when Defendant placed them on hold. (R. 70-2, PCM Order at 17.)

## PROCEDURAL HISTORY

On May 12, 2017, Plaintiff filed a complaint against AT&T Corporation alleging violations of the TCPA. (R. 1, Compl. ¶¶ 25-42.) Plaintiff amended his complaint twice, and the second amended complaint, filed on May 10, 2018, is the operative complaint. (R. 40, Second Am. Compl.) It advances one count for violation of the TCPA against AT&T, Illinois Bell, and

4

Defendant for the allegedly unsolicited calls that Plaintiff received. (*Id.* ¶¶ 2, 5, 15-52.) Plaintiff brings this action on behalf of himself and a putative class consisting of persons who received phone calls from Defendant on or after May 12, 2013, and persons who received a pre-recorded message from Defendant. (*Id.* ¶¶ 53-61.) On June 19, 2018, Plaintiff voluntarily dismissed AT&T and Illinois Bell from this action without prejudice. (R. 57, Voluntary Dismissal.)

On June 15, 2018, Defendant moved to compel arbitration. (R. 56, First Mot. at 3.) The Court denied Defendant's motion without prejudice, finding that the U-Verse terms of service are enforceable and rejecting Plaintiff's argument of unconscionability. (R. 66, Order at 12.) The Court concluded, however, that Defendant had failed to provide sufficient evidence that it was AT&T's agent so as to warrant the arbitration agreement's application in this case. (*Id.* at 12-15.) As a result, the Court permitted Plaintiff to take discovery on the relationship between Defendant and AT&T to test whether Defendant was AT&T's agent. (*Id.* at 16-17.)

On January 11, 2019, after discovery concluded on the agency issue, Defendant filed a renewed motion to compel arbitration. (R. 69, Renewed Mot.; R. 69-1, Mem.) Defendant argues that it acted as AT&T's agent when it made calls to Plaintiff, thereby making the arbitration agreement enforceable as to any dispute between Plaintiff and Defendant. (R. 69-1, Mem. at 8-12.) In support of its motion, Defendant presents declarations from AT&T employees and the contract between Defendant and AT&T. (R. 69-2, Barker Decl.; R. 69-4, Carter Decl.)

Defendant argues that this evidence shows it was AT&T's agent because AT&T retained significant control over how Defendant was to carry out its obligations. (R. 69-1, Mem. at 8-9.) Defendant also contends that it had actual authority to affect AT&T's legal relationships. (*Id.* at 10-11.) Defendant argues that, as a result, any disputes between it and Plaintiff are covered by the arbitration agreement in the U-Verse terms of service. (*Id.* at 12.)

5

Plaintiff, on the other hand, argues that no enforceable arbitration agreement exists between Plaintiff and Defendant. (R. 75, Resp. at 4-8.) In Plaintiff's view, the calls at issue arose before Plaintiff accepted the online terms of service containing the arbitration provision. (*Id.*) Plaintiff also argues that Defendant has no right to enforce Plaintiff's arbitration agreement with AT&T because Defendant is neither a party to that contract nor an intended beneficiary under the contract. (*Id.* at 8-9.) Plaintiff contends that the arbitration agreement is between Plaintiff and Illinois Bell and *Illinois Bell's* agents, not between *AT&T* and its agents. (*Id.*) Thus, according to Plaintiff, it does not matter if Defendant was AT&T's agent because the arbitration agreement only covers Illinois Bell's agents. (*Id.*) Finally, Plaintiff argues that Defendant was not an agent of AT&T but instead hired by AT&T as an independent contractor. (*Id.* at 9-15.)

## LEGAL STANDARD

Under the FAA, courts compel arbitration if the following three elements are shown: "(1) an agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal by the opposing party to proceed to arbitration." *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 466 F.3d 577, 580 (7th Cir. 2006). The U.S. Court of Appeals for the Seventh Circuit has established three bedrock principles related to the enforcement of arbitration agreements: (1) that the FAA "evinces a national policy favoring arbitration;" (2) "an arbitration agreement generally cannot bind a non-signatory;" and (3) "arbitration agreements generally are enforceable against non-signatories only in a handful of limited circumstances, depending on the applicable state law." *A.D. v. Credit One Bank, NA.*, 885 F.3d 1054, 1059-60 (7th Cir. 2018) (internal quotation omitted). "These limited exceptions are: (1) assumption, (2) agency, (3) estoppel, (4) veil piercing, and (5) incorporation by reference." *Id.* at 1060.

While arbitrability of a dispute is generally a question of law, the FAA provides for a jury trial if there is a factual dispute about whether an arbitration agreement was made. *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 751 (7th Cir. 2017). Accordingly, "[j]ust as in summary judgment proceedings, a party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). Furthermore, "[i]n deciding whether the party opposing . . . compelled arbitration has identified a genuine issue of material fact for trial, the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor." *Id* (internal quotations omitted).

Once a district court determines that the parties have agreed to arbitrate, the court must compel arbitration and, upon application by one of the parties, stay the trial of the action until arbitration is completed. *Paragon Micro, Inc. v. Bundy*, 22 F. Supp. 3d 880, 887 (N.D. Ill. 2014) (citing 9 U.S.C. §§ 3-4). Although state law applies to issues of contract formation, "[o]nce it is clear . . . that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032-33 (7th Cir. 2012) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).

## ANALYSIS

### I. Plaintiff's Challenges to Enforceability of the Arbitration Agreement

The majority of Plaintiff's response is directed toward the enforceability of the arbitration agreement between Plaintiff and Defendant, (R. 75, Resp. at 1-9), despite the fact that the Court addressed the arbitration agreement's enforceability in a prior order. (*See* R. 66, Order at 12.) For

7

the sake of completeness, however, the Court considers Plaintiff's argument that the arbitration agreement is not enforceable because Defendant is not a party or signatory to the arbitration agreement. (R. 75, Resp. at 8-9.)

The U-Verse terms of service provide that it "is a binding agreement between you . . . and the AT&T entity that provides the Service[.]" (R. 49-3 at 6, Terms of Service.) "AT&T" is defined in the terms of service as "your local AT&T telephone company," which for Plaintiff—an Illinois customer—is Illinois Bell. (*Id.* at 6, 29 n.1.)

The arbitration agreement within the terms of service includes even more parties to that agreement, as it provides that "AT&T and you agree to arbitrate all claims between you and AT&T," and "AT&T" is defined to include Illinois Bell as well as its "affiliates, agents, employees, predecessors in interests, successors, and assigns[.]" (*Id.* at 22.) Thus, the parties to the arbitration agreement are Illinois Bell as well as Illinois Bell's "affiliates." (*Id.*)

The Court concludes that Defendant was acting as an Illinois Bell "affiliate" when it called Plaintiff and therefore is a party to the arbitration agreement in the U-Verse terms of service. *See, e.g., Dr. Robert L. Meinders, D.C., Ltd. v. UnitedHealthcare, Inc.*, 800 F.3d 853, 857 (7th Cir. 2015) ("The general rule, of course, is that an arbitration agreement binds only the parties to that agreement."). Specifically, in response to interrogatories issued to AT&T Corporation, AT&T Corporation stated that AT&T-affiliated companies called Plaintiff as part of the PCM program. (R. 29-1, Defs.' Resps. at 3-6, 10.) These responses also provide that the calls to Plaintiff were from "AT&T affiliates" made to "customer contact numbers provided by the individuals" who signed up for U-Verse. (*Id.* at 10.) Plaintiff provides no evidence contradicting this evidence which shows that Defendant, the company that called AT&T

8

customers, was an affiliate of AT&T Corporation and its related companies such as Illinois Bell. Thus, Defendant is covered by the arbitration agreement as an "affiliate" of Illinois Bell.

Additionally, Defendant can invoke the arbitration agreement because AT&T is a party to the arbitration agreement, and Defendant was acting as AT&T's agent when it called Plaintiff. Plaintiff does not dispute that AT&T is Illinois Bell's affiliate. (R. 29-1, Defs.' Resps. at 3-6; R. 40, Second Am. Compl. ¶¶ 11-13.) Thus, it is undisputed that AT&T is a party to the arbitration agreement because the arbitration agreement is between Plaintiff on the one hand and Illinois Bell and its "affiliates, agents, employees, predecessors in interests, successors, and assigns" on the other hand. (R. 49-3 at 22, Terms of Service.) A non-signatory to an arbitration agreement can enforce the agreement if the non-signatory is the agent of a party to the arbitration agreement. *Peach v. CIM Ins. Corp.*, 816 N.E.2d 668, 671 (Ill. App. Ct. 2004). As discussed at length below, Defendant is the agent of AT&T who is a party to the arbitration agreement; therefore, Defendant has standing to enforce the arbitration agreement because Defendant's calls were made within the scope of the agency relationship between Defendant and AT&T. *See, e.g., Griffis v. Wells Fargo Advisors, LLC*, No. 13 CV 8372, 2014 WL 3027683, at *5 (N.D. Ill. July 3, 2014) (non-signatory could enforce arbitration agreement because he was an agent of a party to the arbitration agreement and the misconduct alleged was related to duties the non-signatory performed within the scope of the agency relationship). Accordingly, the Court rejects Plaintiff's challenges to the enforceability of the arbitration agreement.

Plaintiff also argues that he agreed to the U-Verse terms of service and accompanying arbitration agreement in March 2016, which was after the phone calls Defendant placed in December 2015. (R. 75, Resp. at 5-8.) Therefore, according to Plaintiff, the arbitration agreement could not cover disputes related to the December 2015 phone calls. (*Id.*) This argument fails

because the arbitration agreement expressly applies to "[c]laims that arose before this or any prior Agreement" relating to the U-Verse service. (*Id.*) The arbitration agreement here covers claims related to the U-Verse service, was contained within the U-Verse terms of service, and Defendant's calls to Plaintiff related to the U-Verse service. (*See* R. 49-3 at 6, 22.) Thus, unlike Plaintiff's cited authorities, the Court is satisfied that Plaintiff's dispute bears enough relation to the subject matter of the U-Verse terms of service and the accompanying arbitration agreement such that the parties must proceed to arbitration. *Cf. Tillman v. The Hertz Corp.*, No. 16 C 4242, 2016 WL 5934094, at *2 (N.D. Ill. Oct. 11, 2016) ("An arbitration agreement is logically and necessarily tied to the underlying contract that specifies arbitration as the agreed upon method of dispute resolution.").

Finally, Plaintiff contends that because AT&T failed to expressly identify Defendant as an intended third-party beneficiary in the arbitration clause, the Court should not compel arbitration. (R. 75, Resp. at 9.) A third-party beneficiary is just one of the types of parties who are not parties to an arbitration agreement but have standing to enforce the agreement. *See A.D. v. Credit One Bank, NA.*, 885 F.3d at 1059-60. The Court has found that Defendant can enforce the arbitration agreement as a party to that agreement and as an agent of a party to the arbitration agreement; thus, there is no need for Defendant to rely on a third-party beneficiary theory to enforce the arbitration agreement. Nevertheless, the Court is unpersuaded by Plaintiff's argument that Defendant is not a third-party beneficiary to the arbitration agreement.

Under Illinois law, for Defendant to be a third-party beneficiary of the arbitration agreement, the agreement must have been made "for the direct benefit of" Defendant, and such benefit "must affirmatively appear from the language" of the arbitration agreement. *Brown v. Worldpac, Inc.*, No. 17 CV 6396, 2018 WL 656082, at *3 (N.D. Ill. Feb. 1, 2018) (internal

quotations and emphasis omitted) (applying Illinois law). The arbitration agreement need not identify Defendant by name, "but it must be identified in some manner, for example, by describing the class to which it belongs." *Id.* at *3; *see also Cont'l Cas. Co. v. Am. Nat. Ins. Co.*, 417 F.3d 727, 734 (7th Cir. 2005) (applying the same principle under Illinois law). For example, in *Brown v. Worldpac, Inc.*, No. 17 CV 6396, 2018 WL 656082, at *3 (N.D. Ill. Feb. 1, 2018), the court found that the defendant's customer could enforce an arbitration agreement as a third-party beneficiary because the arbitration agreement, although it did not explicitly name the defendant's customer, covered all disputes involving the defendant "or its customers." *Brown*, 2018 WL 656082, at *3-4 (emphasis omitted); *see also Manor v. Copart Inc.*, No. 17-CV-2585, 2017 WL 4785924, at *4 (N.D. Ill. Oct. 24, 2017) (subsidiary was a third-party beneficiary of the arbitration agreement because it was a subsidiary of a company that was a party to the arbitration agreement, and the agreement defined the company as including all of its subsidiaries).

The arbitration agreement in the U-Verse terms of service identifies the class to which Defendant belongs—Illinois Bell's "affiliates." (R. 49-3 at 22, Terms of Service.) There is also a clear intent in the arbitration agreement to benefit Illinois Bell's affiliates and provide them the legal right to dispute claims with Plaintiff in arbitration. (*Id.*) Thus, like the defendant's customer in *Brown*, Defendant can enforce the arbitration agreement as a third-party beneficiary because it is an affiliate of Illinois Bell. *See Brown*, 2018 WL 656082, at *3-4; *Manor*, 2017 WL 4785924, at *4. Accordingly, whether under a theory of agency, third-party beneficiary, or simply Defendant being a party to the arbitration agreement, Defendant has the right to enforce the arbitration agreement against Plaintiff. The Court, therefore, compels arbitration and stays this case. *See* 9 U.S.C. §§ 3-4; *Paragon Micro, Inc.*, 22 F. Supp. 3d at 887.

## II. Agency

Next, the parties dispute whether Defendant was AT&T's agent such that Defendant has the right to enforce the arbitration agreement against Plaintiff. (*See* R. 75, Resp. at 9-15.) The test to determine whether a principal-agent relationship exists is whether the alleged principal has the right to control the alleged agent, and whether the agent can affect the legal relationships of the principal. *Uesco Indus., Inc. v. Poolman of Wis., Inc.*, 993 N.E.2d 97, 112 (Ill. App. Ct. 2013); *see also see also Wilson v. Edward Hosp.*, 981 N.E.2d 971, 978 (Ill. 2012) (describing the elements of a principal-agent relationship). "Principal among these considerations is the right to control the manner that the work is done." *Taylor v. Kohli*, 642 N.E.2d 467, 468 (Ill. 1994). Therefore, for Defendant to establish a principal-agent relationship between itself and AT&T, it must show that (1) AT&T had the right to control Defendant; and (2) that Defendant had the power to affect AT&T's legal relationships. *See Uesco Indus., Inc.*, 993 N.E.2d at 112; *Wilson*, 981 N.E.2d at 978. The Court addresses each element in turn.

### A. Right to Control

AT&T retained the services of Defendant and tasked Defendant with making phone calls as part of AT&T's PCM program. (R. 69-2, Barker Decl. at 2.) Defendant, however, was not given freedom to carry out tasks as it saw fit; instead, AT&T retained a significant level of control over the manner and means in which Defendant performed services for AT&T. (R. 69-4, Carter Decl.; R. 70-1, MSA; R. 70-2, PCM Order.) "A hallmark of the principal/agent relationship is the principal's right to control the conduct of the agent." *Wis. Cent. Ltd. v. TiEnergy, LLC*, 894 F.3d 851, 858 (7th Cir. 2018). The right of control, not the actual exercise of

12

control, is the principle factor in distinguishing a servant from a contractor. *McNerney v. Allamuradov*, 84 N.E.3d 437, 454 (Ill. App. Ct. 2017).

Because AT&T exerted significant control over Defendant, the Court finds that the first prong of the agency analysis is satisfied. *See Uesco Indus., Inc.*, 993 N.E.2d at 112. AT&T's control over Defendant can be grouped into two categories: (1) control over Defendant's customer calls, and (2) control over employment decisions and supervision of Defendant's work.

### 1. Customer Calls

AT&T exercised significant control over Defendant by controlling the manner and means by which Defendant was to call and speak to AT&T's customers. Specifically, AT&T required Defendant to use an AT&T-approved script. (R. 69-4, Carter Decl. at 4; R. 69-2, Barker Decl. at 3.) AT&T also had the right to control which customers could be called, and AT&T provided Defendant with its confidential customer list. (R. 69-4, Carter Decl. at 3.) Defendant could not deviate from this list. (*Id.*) AT&T even had control over the call volume and reserved the right to change the call volume as it saw fit. (R. 69-2, Barker Decl. at 4; R. 70-2, PCM Order at 5.)

Notably, the core service Defendant provided AT&T was making phone calls to AT&T customers, (R. 70-2, PCM Order at 4); therefore, it is significant that AT&T retained and exerted control over how those phone calls would be placed. AT&T had control over almost every decision that Defendant might have encountered, from the number of calls Defendant had to make to the precise words Defendant was authorized to say to AT&T customers. (R. 69-4, Carter Decl. at 3-4.) AT&T even controlled the music Defendant played when an AT&T customer was placed on hold. (R. 70-2, PCM Order at 17.) This undisputed evidence is enough to satisfy the control prong of the agency analysis. *See, e.g., Thomas v. Weatherguard Constr. Co.*, 42 N.E.3d

13

21, 24-26 (Ill. App. Ct. 2015) (affirming agency finding where a sales representative was given a script and instructed to hold herself out as working for defendant).

### 2. Control over Employment Decisions and AT&T's Supervision of Defendant

AT&T also controlled how Defendant was to allocate its resources on the PCM program through Defendant's staffing, training, discipline, and equipment decisions. (R. 69-2, Barker Decl. at 4; R. 70-2, PCM Order at 3-14.) This control is also more than enough to satisfy the first element of the agency analysis.

In *Bruntjen v. Bethalto Pizza, LLC*, 18 N.E.3d 215, 239-40 (Ill. App. Ct. 2014), for example, the court held that an agreement between the parties, an operating manual, and the franchisor's contract with the franchisee's employees provided ample evidence that "[the defendant] had the right to control many aspects of [the purported agent's] daily operations." *Id.* at 240. Therefore, the court reasoned that the first prong of the agency test was satisfied because the agreements allowed the franchisor to control "employment decisions, training, safety, daily maintenance, wage and hour requirements, record-keeping, supervision and discipline of employees, and hiring and firing[.]" *Id.*

Similar to the franchisor in *Bruntjen*, AT&T retained significant control over Defendant's employment and staffing decisions. (R. 69-2, Barker Decl. at 4; R. 70-2, PCM Order at 4-14.) For example, AT&T required that Defendant segregate a space (requiring security badge access) for Defendant's employees assigned to the PCM program and required that the equipment those employees used be exclusively used for the PCM program. (R. 70-2, PCM Order at 5-8.) AT&T went even further by controlling the training of Defendant's employees and obligating Defendant to build a "customer simulation lab" for its employees "to learn how to troubleshoot AT&T

customer problems." (*Id.* at 7.) AT&T also required Defendant's employees to meet a certain amount of training hours set by AT&T. (*Id.* at 18-19.)

Finally, AT&T carefully supervised how Defendant carried out its obligations. AT&T required Defendant to provide daily reports and a detailed quality assurance plan. (*Id.* at 9-14.) AT&T placed an onsite manager with Defendant who monitored Defendant's work. (R. 69-4, Carter Decl. at 5-7.) AT&T also had the right to conduct regular site visits at Defendant's offices. (R. 70-1, MSA at 3.) Accordingly, the control prong in the agency analysis is satisfied in this case. *See Bruntjen*, 18 N.E.3d at 239-41.

### B. Defendant was authorized to affect AT&T's legal relationships.

Turning to the second prong of the agency analysis, whether Plaintiff was authorized to affect AT&T's legal relationships, *see Uesco Indus., Inc.*, 993 N.E.2d at 112, Defendant has presented undisputed evidence showing that it had the authority to affect AT&T's legal relationships. "Agency may be actual or apparent." *Paul v. ING Fin. Partners Inc.*, No. 3-09-0588, 2010 WL 8544601, at *5 (Ill. App. Ct. 2010). "Actual agency occurs by either express or implied authority." *Id.* "An agent has express authority when the principal explicitly grants the agent authority to perform a particular act." *Id.* A contract that explicitly creates an agency relationship is the most basic example of actual authority. *E.g., Zahl v. Krupa*, 850 N.E.2d 304, 311 (Ill. App. Ct. 2006). "Implied authority is actual authority proved by circumstantial evidence or authority that is inherent in an agent's position." *Id.*

The Court finds that the undisputed evidence leads to the conclusion that Defendant had actual authority to bind AT&T. The MSA and PCM Order give Defendant express authority to make calls to customers representing itself as "AT&T," to solicit AT&T customers for additional AT&T services, and to close sales for AT&T's U-Verse service. (R. 70-1, MSA at 14; R. 70-2,

15

PCM Order at 3-4.) This fits squarely within the realm of actual authority. *See Curto v. Illini Manors, Inc.*, 940 N.E.2d 229, 233 (Ill. App. Ct. 2010) (observing that actual authority "may be granted through a written contract").

Thus, the Court concludes that the second prong of the agency analysis is satisfied. *See Uesco Indus., Inc.*, 993 N.E.2d at 112. With both elements of the agency test satisfied, the Court finds that Defendant was acting as AT&T's agent when it made the phone calls to Plaintiff. *See id.* Accordingly, the Court must compel arbitration because, as explained above, AT&T is a party to the arbitration agreement and Defendant has standing to compel arbitration as AT&T's agent. *See Griffis*, 2014 WL 3027683, at *5; *Peach*, 816 N.E.2d at 671.

The Court rejects Plaintiff's arguments challenging the agency relationship between Defendant and AT&T. First, Plaintiff argues that Defendant is not AT&T's agent because AT&T identifies Defendant as an independent contractor in the MSA. (R. 75, Resp. at 9-10.) The MSA's independent contractor clause provides, however, that Defendant "is engaged in an independent business and, *except as specifically provided herein*, shall perform all obligations under this Agreement as an independent contract[.]" (R. 70-1, MSA at 2 (emphasis added).) That clause does not apply here because the MSA unambiguously carves out an exception to this provision for when Defendant is making marketing calls to AT&T customers. (*Id.*) Because this case involves marketing calls to Plaintiff, (R. 69-4, Carter Decl. at 6), Defendant acted as AT&T's agent and not an independent contractor.[4]

In addition, Illinois agency law requires courts to rely on the facts of each case to determine whether an agency relationship exists regardless of contractual labels. A written

---

[4] Plaintiff argues that these were not marketing phone calls, but Defendant presents unrebutted evidence showing that these calls were designed to retain paying customers, and that the PCM program was overseen by AT&T's marketing division. (R. 69-4, Carter Decl. at 6.)

16

contract is not conclusive of the relationship between the alleged agent and the alleged principal. *Bruntjen*, 18 N.E.3d at 239. Thus, even if the agreement between AT&T and Defendant had exclusively labeled Defendant as an "independent contractor," Illinois agency law requires the Court to look beyond that provision and find that Defendant is AT&T's agent because the evidence shows AT&T had control over Defendant and that Defendant could affect AT&T's legal relationships. *See id.* at 239-42. Accordingly, the Court grants the motion to compel arbitration.

## CONCLUSION

For the foregoing reasons, Defendant's renewed motion to compel arbitration (R. 69, Renewed Mot.) is GRANTED. The Court STAYS all further proceedings in this matter until the parties have completed arbitration of this dispute.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: April 3, 2019**